200 Cal.App.2d 757 (1962)
Estate of ELECTA B. HARTSON, Deceased. ASENATH H. COPE, Claimant and Respondent,
v.
THOMAS TURNER et al., Claimants and Appellants.
Civ. No. 20155. 
California Court of Appeals. First Dist., Div. One. 
Feb. 27, 1962.
 Jefferson E. Peyser for Claimants and Appellants.
 Roland C. Foerster, Morrison, Foerster, Holloway, Shuman & Clark and Girvan Peck for Claimant and Respondent.
 TOBRINER, J.
 While the words which the draftsman used in the testamentary trust involved here might be construed to produce an intestacy or a distorted distribution of the share of the income in dispute, we believe that a proper construction of the trust will effectuate the design and purpose of the testatrix without incurring these undesirable consequences and without transgressing upon principle or previous decision.
 We probe here an appeal from an order instructing the trustee of a testamentary trust as to the persons entitled to receive the income of the trust after the death of Mrs. Ethel Hartson Turner, the granddaughter of the testatrix. Appellants, the son and daughter of Mrs. Turner, and the great- grandchildren of the testatrix, raise three issues on appeal: (1) Are they entitled to 4/12ths of the income formerly received by their mother as the sole legal heirs of their grandfather on the theory that the right to the income descended to them, or does respondent, the testatrix' daughter, take under the substitutionary clause of the will? (2) Are appellants entitled to the 1/12th of the income received by their mother from their great-uncle, Channing? (3) Did the *760 trial court err in its construction of the term "Phoenix Block" as used in the trust, and if so, did the income which was directly bequeathed to their mother descend to appellants? For the reasons pointed out infra, we have found in favor of appellants on the first and second propositions and of respondent on the third.
 Electa B. Hartson (hereinafter referred to as "testatrix") died in 1902, leaving a will with codicil which created the trust with which we are here concerned. The will and codicil were admitted to probate, and the court entered a final decree of distribution on November 21, 1903. The significant portions of the trust follow: "That said Trustees shall monthly reserve from the rents and income of said property a certain sum which will be sufficient in their judgment to pay the taxes, insurance, repairs and expenses ... and shall pay the remainder of said monthly income as follows: "The Income from the Phoenix Block:
 "One-third (1/3) thereof to her daughter, Daisie A. Hartson; one-third (1/3) thereof to her son, Channing K. Hartson; and the remaining one-third (1/3) to her son, Burnell C. Hartson; and the income from the balance of said trust property said Trustees shall pay:"
 "One-third (1/3) thereof to her daughter, Daisie A. Hartson; one-third (1/3) thereof to her son, Channing K. Hartson; and the remaining one-third (1/3) to her son Burnell C. Hartson, and his daughter, Ethel Hartson, as follows: one-quarter (1/4) of said one-third (1/3) to said Ethel Hartson, and the remainder to Burnell C. Hartson."
 "That said Trustees shall pay the income of said property as above set out, for and during the term of the natural lives of her said children, and upon the death of any one of her said children then the amount which should have been paid to such deceased child as his or her share therein, shall be paid by the said Trustees to the legal heirs of her said deceased child, if there should be any living at such time, and if not, then the share of such deceased child shall be divided between the remaining living children."
 The trust provides for its termination and specifies that, upon such termination, the distribution of the corpus will be as follows:
 "That upon the death of her last surviving child, then said trust shall absolutely cease and determine, and the Trustees surviving shall convey all of the property still remaining in their hands as Trustees to the surviving heirs of each of her *761 children, in the same proportions and amount as her said children or their heirs were each receiving in the income of said property at the time of his or her death."
 Three of her children survived the testatrix: Daisie A. Hartson, who subsequently became Asenath H. Cope (hereinafter referred to as "respondent"); Channing K. Hartson (hereinafter referred to as "Channing"); and Burnell C. Hartson (hereinafter referred to as "Burnell"). Testatrix also left surviving her a granddaughter, Ethel Hartson, the daughter of Burnell, who subsequently became Ethel Hartson Turner (hereinafter referred to as "Mrs. Turner"). The respondent remains as the last surviving child of testatrix.
 On the date of Mrs. Turner's death she was receiving 5/12ths of the trust income. She received 4/12ths of the income as the last surviving heir of her deceased father, Burnell; she enjoyed 1/12th of the income as one of the heirs of her uncle, Channing.
 We set forth the history of Mrs. Turner's acquisition of the 4/12ths of the income. Burnell died in 1928 leaving as surviving heirs Elizabeth Hartson, his wife (hereinafter referred to as "Elizabeth"), and Mrs. Turner, his daughter. These two persons succeeded in equal portions to the stated share. When Elizabeth died in 1930, Mrs. Turner, as the sole surviving heir of Burnell, took the share that Elizabeth had been receiving, thus giving to Mrs. Turner, in all, 4/12ths of the income.
 The parallel history of Mrs. Turner's acquisition of the additional 1/12th share of the income relates to the death of her uncle, Channing. When Channing died in 1930 he left as surviving heirs his wife, Ida, who is presently alive; his sister, the respondent; and his niece, Mrs. Turner. Ida took 2/12ths, respondent, the sister, took 1/12th, and the remaining 1/12th went to Mrs. Turner by right of representation through her father, Burnell, who would have received it if he had been living.
 Thus, at the time of her death, Mrs. Turner received 5/12ths of the trust income. She derived 1/12th as one of the legal heirs of her uncle, Channing. She received 4/12ths as the legal heir of her father, Burnell. As to this latter, 1/4th of the 4/12ths, or 1/12th, came to her as a direct bequest in the event that there were any income from the property other than the Phoenix Block. It will be recalled that the testamentary trust provided that as to income from the "balance of said trust property" there would be distributed "One-quarter *762 (1/4) of said one-third (1/3) to said Ethel Hartson. ..."
 The trial court found that no income accrued from the balance of said property; that the term " 'Phoenix Block' " comprised all the real property designated in the decree as " 'Tract B'. ..." The parties have stipulated that no other real property remains in the trust other than that so designated. In that event the direct bequest of a portion of the income from property other than the Phoenix Block to Mrs. Turner does not take effect. Appellants, however, except to the finding; we have nevertheless concluded, as we point out infra, that as to this issue the trial court was correct.
 The trustee, American Trust Company, filed a petition for instructions as to the proper party to receive the share of the income formerly paid to Mrs. Turner. On March 14, 1958, the court directed that the income be paid to respondent. Later, at the request of appellants, the court, pursuant to section 473 of the Code of Civil Procedure, vacated the order. Appellants thereupon claimed to be the sole heirs of their mother, Mrs. Turner, and the present heirs of their grandfather, Burnell, and hence entitled to the share of the income which their mother received prior to her death. The court held another hearing and in a memorandum decision dated February 3, 1960, followed by an order instructing trustee, and by findings of fact and conclusions of law, rejected appellants' claims. The court ruled that respondent is now entitled to 10/12ths of the trust income and appellants are entitled to nothing. The latter order thus reached the same conclusion as the order of March 14, 1958.
 Appellants have appealed from the memorandum decision, with the exception of that portion ordering respondent to prepare appropriate findings of fact and conclusions of law. The court likewise ordered and directed the trustee to pay the income in accordance with the above ruling, and appellants have also appealed from that order. Both appeals, of course, deal with the same subject matter.
 We shall first explain why we have concluded that respondent cannot take the 4/12ths share of the income under the substitutionary clause; we shall then point out that appellants are entitled to this share because it is descendible to them; we next point out that on similar reasoning they take the 1/12th share which Mrs. Turner received from Channing; finally, we explain why we believe the trial court properly concluded that the term " 'Phoenix Block' " included all *763 real property described in the decree under the caption " 'Tract B.' ..."
 [1] We begin with the proposition that respondent cannot take the 4/12ths share of the income under the substitutionary clause. The will provides: "[U]pon the death of any one of her said children then the amount which should have been paid to such deceased child ... shall be paid ... to the legal heirs of her said deceased child, if there should be any living at such time, and if not, then the share of such deceased child shall be divided between the remaining living children." (Emphasis added.) The will thus creates a gift over to the remaining living children of the testatrix if and only if a child dies without leaving "legal heirs" at the time of his death. If a child dies leaving such heirs, the gift over fails at that moment, for the event upon which the gift is conditioned has not occurred. Under the terms of the will the gift cannot operate, as respondent assumes, on the death of a child's heirs at some time subsequent to the death of the child.
 Respondent argues that Mrs. Turner received the share "as the last surviving member of a class comprised of the heirs of Burnell"; that Mrs. Turner's interest "was contingent upon her being alive when Burnell died" and when the income was distributed. (Emphasis partly added.) Mrs. Turner did not so survive. Thus the class became extinct, says respondent, and respondent "as the only then surviving child of the Testatrix" became entitled to the share. (Emphasis added.) Respondent could not, however, take "upon the death" of Burnell, because Burnell did "at such time" have legal heirs; consequently, "at such time" the substitutionary clause did not apply. Since "such time" has passed forever, respondent cannot now, at Mrs. Turner's death, set back the clock. She cannot now qualify as a "remaining child" under the substitutionary clause because she did not qualify at the crucial time fixed by the testatrix.
 The above conclusion is inescapable in that the will fixed a condition upon respondent's taking and the condition was never fulfilled. The will states that "upon the death" of a child, the child's share goes to his legal heirs "if there should be any living at such time," (that is, the time of the death of the child) "and if not" (that is, if there are no heirs living at the death of the child), then such share shall go to the remaining children of the testatrix. [2] A gift conditioned upon the occurrence of a specific event cannot be consummated *764 in the absence of that event. (Estate of Catlett (1953) 117 Cal.App.2d 315, 317 [255 P.2d 464].)
 As we have stated above, we believe Mrs. Turner's share went to appellants. We shall point out that the purpose and design of the will demonstrates the validity of such a conclusion. Behind the facade of indistinct draftsmanship, we can discern the outlines of the plan devised by the testatrix. She attempted to sever her estate into three essentially equal shares, leaving one share to each of her children, and, after his death, to his progeny. Only when one of her children died without leaving descendants at his death did she intend that the share reserved for one bloodline should shift over to the remaining children and their descendants. She also intended that, upon the death of the last surviving child, the corpus of the trust should go to the issue or descendants of each child in essentially equal portions. Thus she provided that "[u]pon the death of her last surviving child" the trustees convey the property "to the surviving heirs of each of her children, in the same proportions and amount as her said children or their heirs were each receiving in the income of said property at the time of his or her death." (Emphasis added.) Thus the testatrix obviously desired that the share of one line be redistributed among the survivors only in the event that the line became extinct at the death of the child.
 Two approaches to this unique testamentary trust lead to appellants taking Mrs. Turner's share of the income. The first approach rests upon the theory that Burnell's share vested in Mrs. Turner, his daughter, when Elizabeth, his widow, died; that Burnell left surviving him Elizabeth and Mrs. Turner and that upon Elizabeth's death, his sole heir was Mrs. Turner. We believe this approach is not inconsistent with the ruling in Estate of Hartson (1933) 218 Cal. 536 [24 P.2d 171]. The second approach proceeds upon the basis that, whether or not the share vested in Mrs. Turner, the plan of the testatrix shows that her use of the words "legal heirs" included the issue or descendants of testatrix, and upon that basis appellants take.
 [3a] We turn to the first theory. If we are to effectuate this intended equal distribution of the income as to the lines of her descendants, to the "heirs" of each of her children, we must hold that under the present circumstances Mrs. Turner's share vested. [4] As the court stated in Estate of Puett (1934) 1 Cal.2d 131, 133 [33 P.2d 825]: "It is generally recognized that a testamentary instrument is to be examined with a view to discovering the decedent's testamentary scheme *765 or general intention, and that the apparent meaning of particular words, phrases and provisions is to be subordinated to this scheme, plan or dominant purpose. [5] The technical import of words should not prevail over the obvious intent of the testator." Moreover, if we do not hold that Mrs. Turner's share so vested, we produce an intestacy. Since the substitutionary clause does not apply, the share would, if no other considerations enter, be distributed by intestacy. [6] A cardinal canon of interpretation, however, forbids that construction of a testament which creates an intestacy. Moreover, in the situation of a testamentary trust in which the testator indicates a desire for an equal distribution of his property, the courts will strive to achieve such equality.
 [7] As to the principle of construction that the will should not be so construed as to reach an intestacy we quote from Estate of Hart (1957) 151 Cal.App.2d 271, 282 [311 P.2d 605]: "The fact that a testator makes a will raises a presumption that he intended to dispose of all of his property (Estate of Olson, 144 Cal.App.2d 694, 696-697 [301 P.2d 501]; Estate of Olsen, 9 Cal.App.2d 374, 379 [50 P.2d 70]) and wherever a testamentary provision may be given either of two meanings, that meaning should be given to it which will prevent intestacy, either entire or partial (Estate of Akeley, 35 Cal.2d 26, 29 [215 P.2d 921, 17 A.L.R.2d 647]; Estate of Duncan, 145 Cal.App.2d 612, 615 [302 P.2d 892]; Estate of Carroll, 138 Cal.App.2d 363, 369 [291 P.2d 976])." Indeed, Probate Code section 102 provides: "The words of a will are to receive an interpretation which will give to every expression some effect, rather than one which will render any of the expressions inoperative; and of two modes of interpreting a will, that is to be preferred which will prevent a total intestacy." (See also: Estate of Lawrence (1941) 17 Cal.2d 1, 7 [108 P.2d 893].)
 The disposition of the courts to effectuate the intent of a testator to provide for equal disposition of trust income is exemplified by Estate of Stanford (1957) 49 Cal.2d 120 [315 P.2d 681]. In that case, the will provided that part of the net income of designated trust funds should be paid to Amy Hansen for her lifetime, and " 'upon her death [the] trust shall cease' " and 1/3d of the corpus " 'shall belong and be delivered to the child or children of' " Amy. (P. 123.) Amy's son, Walter, predeceased her. Holding that the remainder vested in Walter upon the death of the testatrix with the right of possession postponed, the court ruled that Walter's successor *766 would share in the distribution of the corpus following Amy's death.
 The Supreme Court decided that the successor's remainder man rights were not contingent upon Walter's surviving his mother, the life tenant. In reaching this result, the court carefully analyzed the "design," "plan," and "pattern" (p. 132) of the will, noting that the will divided "the remainder equally between, on the one hand, Charles, who had children, and, on the other hand, the descendants of Daniel." (P. 132.) The court repeatedly notes the attempt of equality of distribution intended by the testatrix and relies upon that desire as one important basis for its result. The court points out that "the testatrix would not have wished to treat unequally descendants of Daniel having the same relationship to him. Yet, if she were held to have intended a condition of survival with respect to the remainders following the life interests of Jennie Lawton and Amy Hansen, such a situation could easily have arisen. For example, so far as the testatrix knew, all children of Jennie might die before her but leave children of their own, who would be entitled to nothing under the contingent construction, whereas, if Amy's children should survive her, their children might expect to benefit." (P. 133.) The court concludes as to this matter: "It should not therefore be supposed that the testatrix would have intended that Daniel's great-grandchildren through Jennie Lawton and Amy Hansen would not benefit if their parents failed to survive the intervening trusts." (P. 133.)
 The court explains that "so far as the testatrix knew, it was possible that Walter would be the only child Amy Hansen would ever have and that Walter would predecease his mother, leaving children of his own." (Pp. 133- 134.) If the remainder were to be held contingent "on survival of Amy, Walter's children could not benefit from it. ..." (P. 134.) The court thus concluded: "It is doubtful that the testatrix would have intended to use language making such a development possible, particularly when ... she expressly provided in the clause involving the Gunnings that, if either of them failed to survive the intervening trust, his children should take. ..." (P. 134.)
 [3b] We believe that in order to avoid intestacy, to effectuate the design of the testatrix as expressed in the will, and to fulfill the desire of equality here which parallels that in Stanford, we must conclude that Mrs. Turner's share vested so that appellants take as the blood descendants of testatrix. *767
 Although respondent contends that Estate of Hartson, supra, 218 Cal. 536 forbids this construction, we believe this case does not apply to the particular and peculiar facts which govern appellants' claim. In Hartson the Supreme Court held that the share of Burnell's wife, as his "legal heir," did not vest in her at his death, but was conditioned upon her surviving until the time for payment of the income. The court held that upon her death, her share descended to Mrs. Turner as the last surviving member of the class composed of the heirs of Burnell, that is, Elizabeth, Burnell's widow, and Mrs. Turner. The court found itself forced to the conclusion that Elizabeth's share did not vest because the court could not presume that the testatrix would have intended that the income be paid to strangers, especially when, on the death of the last surviving child, the trust provided that the corpus was to be distributed to the " 'surviving heirs of each of her children'. ..." (P. 541; emphasis added.) (See Estate of Boyd (1938) 24 Cal.App.2d 287, 289 [74 P.2d 1049]; Estate of Wilson (1924) 65 Cal.App. 680, 689 [225 P. 283].)
 The situation in Hartson may be distinguished from the instant one in two vital respects, one of which, pursuant to the reasoning of Hartson, supports the vesting of Mrs. Turner's interests in the present circumstances. In the first place, in Hartson the court dealt with the descent of property following the death of one who was not the last surviving member of a class. In the instant case, Mrs. Turner was the last surviving member of the class. In the second place, as stated in Estate of Stanford, supra, 49 Cal.2d 120, 129, "Estate of Hartson, 218 Cal. 536 [24 P.2d 171], and In re Winter, 114 Cal. 186 [45 P. 1063], did not apply the erroneous rule of Estate of Cavarly, supra, 119 Cal. 406 [51 P. 629], that in case of class gifts there is a condition of survivorship and may also be distinguished on the basis of the language used in the instruments construed." Hartson reached its result because of language in the will which showed that the testatrix did not desire the trust to benefit strangers but ultimately to serve those related to testatrix' children. Clearly the language of the testatrix does not show an intent to exclude her great-grandchildren, the appellants in this case. As we stated above, Hartson does not rely upon the erroneous rule, followed in Estate of Cavarly (1897) 119 Cal. 406 [51 P. 629] "that in case of class gifts there is a condition of survivorship" (Estate of Stanford, supra, 49 Cal.2d 120, 129); hence, unless language in the will commands a contrary result, such *768 a condition of survivorship in the case of class gifts should not be implied. Because the will contains no such impelling language as to appellants here, no such condition is implied, and Mrs. Turner's interest descends to them.
 The later case of Estate of Lawrence, supra, 17 Cal.2d 1, indicates the limited scope of Hartson; there, the decision of the court, citing Hartson, demonstrates that the reasoning of Hartson will not be followed if it leads to intestacy, even if, to prevent intestacy, the property goes to strangers. The court states: "Although it has been held that where a will is capable of two interpretations, under one of which those of the blood of the testator will take, while under the other the property will go to strangers, the interpretation by which the property goes to those of the blood is preferred [citations], nevertheless, the said rule does not apply where in order to prefer those of the blood of the testator, it is necessary to ignore the presumption against intestacy and in favor of upholding the intent of the testator as expressed in his will." (P. 12.)
 [8a] We now turn to the second approach which we set out above. Even if we were to assume that Mrs. Turner's interest did not vest, appellants, as the "legal heirs" of a deceased child of the testatrix, would be entitled to the share of the income which she formerly enjoyed.
 The trust created a class which was to share the income. The trust refers to the "legal heirs" of a deceased child. The members of this class, then, would be the "legal heirs" of Burnell. A careful examination of the will shows that the words "legal heirs" are not used in their technical sense, because such a construction would completely destroy the applicability of the gift over to the "remaining children." The "remaining children" of the testatrix may take only if a child dies without "legal heirs"; yet a person who dies leaving brothers and sisters cannot die without legal heirs since a brother or sister is a collateral heir. Hence the words "legal heirs" here could not have been used in the strict and legalistic sense; we must construe the term to conform to the natural, and probable intention of the testatrix. [9] As Justice Peters stated in Estate of Torregano (1960) 54 Cal.2d 234, 251 [5 Cal.Rptr. 137, 352 P.2d 505], "Strict adherence to the technical meaning of words and phrases must give way, if inconsistent with the testator's intent as shown by the will as a whole (Estate of Olson, 144 Cal.App.2d 694 [301 P.2d 501])."
 [8b] In the light of the testamentary plan, evidenced by *769 the will, which we have reviewed supra, we believe the words "legal heirs" as used in this trust include the issue or descendants of testatrix. Indeed, such a construction conforms perfectly with her intention to benefit all of her descendants with relative equality.
 The Restatement of the Law of Property (1940) volume III, section 305, comment r, sustains this interpretation: "Contrary intent--Gift over on death without heirs. The fact that the limitation to the 'heirs' of a designated person is, in terms, subject to defeasance on the death of such person without heirs in favor of persons who are, or could be, collateral heirs of the designated ancestor tends to establish that the conveyor did not have in mind a group to be ascertained in accordance with a statute dealing with the intestate succession of property. This tendency is very strong because otherwise the gift over would be a nullity." (Last emphasis added.)
 The Restatement thus refers specifically to a situation like the instant one, in which the restricted version of "heirs" engenders an impossible result by destroying the substitutionary clause. In that event, the Restatement holds that the testator's wishes may be effected by an interpretation of the term "heirs." The Restatement explains, "there still remains the problem of determining the persons who are described as conveyees by the limitation to the 'heirs.' In this situation a construction that the word 'heirs' means the same as the word 'issue' (see 292), is justified because the word 'issue' gives the widest possible distribution which is consistent with the language used." We note, however, that "legal heirs" need not be limited to issue, thereby depriving spouses of children of a share in the estate. We interpret the words as used in these special circumstances as inclusive of issue.
 The interpretation of "legal heirs" as inclusive of "issue" particularly applies to the instant case. Not only does it precisely fit the situation created by the gift over to the remaining children and prevent the property from going to strangers, but it also serves to carry out the testatrix' intent in regard to another portion of the will. The testatrix provided that upon the death of her last surviving child, the trust terminates and the corpus goes "to the surviving heirs of each of her children, in the same proportions and amount as her said children or their heirs were each receiving in the income of said property at the time of his or her death." This final provision is but another example of the planned equality of distribution inherent in the testamentary scheme; the property *770 is to go to the heirs of each of her children. A construction of the term "legal heirs" to include "issue" yields full benefit to each branch of her family. In view of this clear design, the testatrix surely did not propose to overlook Burnell's branch of her family, and his appellant grandchildren, in order that her daughter, as part of another branch of the family, take almost the whole of the income.
 We conclude that the testatrix did not draw an elaborate will which sought to cover every contingency and yet provide for intestacy in one clearly foreseeable event; she clearly did not contemplate intestacy in the special circumstance here presented. Nor did she intend a gift over to her remaining children in this situation because she forbade that result by the express language of the will. Having dealt with and rejected these two possibilities, we effectuate the only possible remaining disposition: that is, that the share should descend to the issue of Burnell living at the death of their parent. In the fortuitous circumstance that the testatrix' granddaughter predeceased testatrix' daughter, testatrix did not, as the pattern of the testament shows, mean to cut off the Turner children solely because their mother did not survive the trust. In the normal course of events the term "legal heirs" would suffice to effectuate an equality between the heirs of the children, and the Burnell line would receive its share of the income until the termination of the trust.
 Since we have reached this conclusion for the reasons set forth above, we do not find it necessary to discuss appellants' theory that the "legal heirs" of Burnell and Channing "are those persons who would have qualified as their legal heirs at the time the particular income was to be distributed," since the latter approach renders the same result.
 [10] We next turn to the distribution of the 1/12th share to which Mrs. Turner became entitled at the death of her uncle, Channing. Upon Channing's death, the share of the income which he formerly enjoyed went to his "legal heirs"; Mrs. Turner, respondent, and Ida. Upon the death of Mrs. Turner, we believe that appellants became entitled to the share of the income which she formerly enjoyed. The reasoning set forth above sustains this result.
 Even though certain factors supporting our holding as to the proper distribution of the share of the income derived from Burnell do not apply here, the present situation, like that as to the Burnell share, is distinguishable from Hartson in that we do not encounter the most important single factor *771 presented in Hartson: the fact that the claimants were strangers to the testatrix. Appellants are not strangers to the testatrix. Although testatrix' will clearly showed that she did not wish her property to go to those with whom she was not related in the blood, our holding does not work this result. We therefore adhere to the rule emphatically set down in Estate of Stanford, supra, 49 Cal.2d 120 that a condition of survival is not implied into class gifts unless there is language in the will commanding such a result. We find no such contrary language in the instant case.
 The testatrix has shown no preference for one branch of her family over another; yet respondent wishes us to hold that upon the death of Mrs. Turner, the share of the income which she received at Channing's death should shift from her branch of the family to respondent's branch, although Mrs. Turner left two children surviving her. Such a proposed result finds no support in the will, which attempted to create an equality of distribution among the various bloodlines, until such bloodlines became extinct. Respondent's claim rests, not upon any overall plan of the testatrix, but upon a misapplication of the rule of construction of Estate of Hartson, supra, 218 Cal. 536. The factual situation here basically differs from that of the cited case.
 [11] Finally, the trial court properly concluded that the term " 'Phoenix Block' " included all the real property held in the trust estate and that the designation " 'Phoenix Block' " and " 'Phoenix Block and Livery Stable' " are synonymous. It will be recalled that the trust provided that the "income from the balance of said trust property" should be paid in a designated manner and that "[o]ne-quarter (1/4) of said one-third (1/3)" should be paid to Mrs. Turner. Thus, as to this balance of the property, the trust provided a direct gift to Mrs. Turner. If, then, there were property which fell within the "balance" of the trust property, Mrs. Turner's 1/12th direct share would be differently disposed of, and subject to a different determination, than that set forth supra.
 An analysis of the trust disposes of appellants' contention that the words " 'Phoenix Block' " and " 'Phoenix Block and Livery Stable' " designate different properties. The testatrix in Article 7 of the will entrusts various parcels of real property to the trustees, grouping the parcels in "tracts." The document set up seven tracts; we are concerned with Tract B, *772 which is described as follows: " 'B'--The real property situated in the City of Napa commonly known and called the 'Phoenix Block' and the Livery Stable adjoining the same on the rear, and fronting on Main Street; said property being Lots No's. One, (1) Two, (2) Three, (3) and a portion of Lot Four (4) in Block No.--Seven (7) of that part of the City of Napa known as Napa City, together with the tenements and appurtenances thereunto belonging." Since all of the property other than the Phoenix Block has apparently been sold by the trustees, pursuant to the will, the sole remaining property consists of that in Tract B.
 The trial court set forth cogent reasons why " 'Phoenix Block' " and " 'Phoenix Block and Livery Stable' " did not designate different pieces of property. As Judge Blanckenburg of the superior court pointed out, first, the "income has at all times been paid by the trustees to the beneficiaries on the basis that all income was from the Phoenix Block." Moreover, during the periods when Mrs. Turner would have been entitled to additional income if she were to receive direct payments from property other than the Phoenix Block, "she raised no objection to the many accounts rendered by the trustee." As the court points out, "a strong inference arises that ... [Mrs. Turner] as well as the trustee and everyone else concerned, considered all trust income accrued from the Phoenix Block." Second, the "decree of distribution includes Lots 1, 2, 3 and a portion of Lot 4 in Block 7 of Napa City in the single paragraph designated 'Tract B'." Third, the numerous accounts spoke of the designated lots as comprising the Phoenix Block without mention of the livery stable. As the court states, "[I]t must be assumed that it [the livery stable] is included in one of the other three designations." Fourth, the will contains a "specific direction ... not to sell the Phoenix Block." Then follows the word "except" and an explanation as to "when the 'Livery Stable property adjoining said block' might be sold. ..." "By use of the word 'except,' Testatrix indicated she thought the prohibition against sale of the Phoenix Block included the whole of Tract B except insofar as she expressly modified the prohibition concerning the Livery Stable."
 Appellants' contentions as to this subject fail. They argue that this court has the power to redetermine the meaning of the terms used but they offer no aid to such redetermination, except a discussion of the language. Indeed, after the trial *773 court reached a tentative determination of this issue it offered appellants the opportunity to adduce further evidence; appellants failed to do so. Appellants, indeed, offer no proof which discloses any error in the court's decision on this matter. Indeed, at the time, many years ago, when the court framed the original decree, facts may well have been introduced to disclose the name commonly given to the property. We can ascertain no reason to upset the trial court's careful adjudication of this issue.
 In essence we believe the rules for the construction of testamentary documents are not museum pieces for iron-clad canons, but doctrines which time and experience have shown to be reliable means for the ascertainment of the intent of the testator. We have used them for that purpose here; they identify, as well as support, the design of this trust and the disposition of the income which we have described.
 The memorandum decision of February 3, 1960, and the order of May 19, 1960, are affirmed in all respects, except that the trial court is directed to make all necessary orders to instruct the trustee to pay to appellants 5/12ths of the net income from the trust under the terms of the will of Electa B. Hartson payable after May 5, 1957. The costs on appeal are to be borne equally by the parties.
 Bray, P. J., and Sullivan, J., concurred.